USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/18

---

MATTHEW BATE,

               Plaintiff,

- against –

THE CITY OF NEW YORK, and
DETECTIVE GERARD SARDINA,

               Defendants.

**MEMORANDUM
OPINION & ORDER**

15 Civ. 2631 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Matthew Bate brings claims against the City of New York ("the City")

and New York City Police ("NYPD") Detective Gerard Sardina for, inter alia, (1) violations of

42 U.S.C. § 1983 premised on false arrest and malicious prosecution; and (2) false arrest,

malicious prosecution, and assault and battery under state law.[1] (See SAC (Dkt. No. 19) ¶¶ 61-

85).

        Defendants have moved for summary judgment on all of Plaintiff's remaining

claims. (Mot. (Dkt. No. 47) at 1)[2] For the reasons stated below, Defendants' motion for

summary judgment will be granted.

---

[1]  The Second Amended Complaint ("SAC") also asserted claims for (1) negligent hiring,
retention, training and supervision; (2) intentional infliction of emotional distress; (3) negligent
infliction of emotional distress; and (4) municipal liability under Monell. (See SAC (Dkt. No.
19) ¶¶ 86-106) This Court dismissed those claims in an August 26, 2015 Order. (Order (Dkt.
No. 26) at 28)

[2]  The page numbers of documents referenced in this decision generally correspond to the page
numbers designated by this District's Electronic Case Filing system. Citations to depositions are

# BACKGROUND

## I.   FACTS[3]

### A.   Bate's Employment at Big Brothers Big Sisters

Plaintiff Matthew Bate graduated from New York University's Silver School of

Social Work in 2013 with a master's degree in social work. (Pltf. Resp. to Def. R. 56.1 Stmt.

(Dkt. No. 57) ¶ 77; Def. R. 56.1 Resp. (Dkt. No. 59) ¶ 77)  In January 2014, Bate began working

for Big Brothers Big Sisters as a program manager. (Def. R. 56.1 Statement (Dkt. No. 49) ¶ 8;

Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 8)  As a program manager, Bate was responsible

for maintaining order, and ensuring that the students were "properly participating and acting

appropriately." (Bate Decl. (Dkt. No. 54) ¶ 12)

Bate managed a Big Brothers Big Sisters program that took place at the offices of

New York Life, located at 27 East 27th Street.  Sessions took place after school on either a

Tuesday or Thursday, every other week, from approximately 4:00 p.m. to 6:00 p.m. (Def. R.

56.1 Statement (Dkt. No. 49) ¶ 9; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 9)  The adult

mentors were New York Life employees, and the student mentees were in the seventh grade at

---

to the page numbers of the transcripts, while citations to NYPD DD5 reports and student
complaints are to Bates number.

[3] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it
has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).  Where
Plaintiff disputes Defendants' characterization of cited evidence, and has presented an
evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.
See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational
factual inferences in non-movant's favor in deciding summary judgment motion).  Unless
otherwise indicated, the facts cited by the Court are undisputed.

P.S. 111. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 10; Shea Decl. (Dkt. No. 55) ¶ 1;

Lopez Decl. (Dkt. No. 53) ¶ 1; Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57)

The Big Brothers Big Sisters program at New York Life was divided into two

sections, with each group consisting of approximately ten adult mentors and ten students. (Bate

Decl. (Dkt. No. 54) ¶¶ 4-5; McGuinness Decl., Ex. B (Bate Dep.) (Dkt. No. 52-2) at 32:10-22)

Each student was paired with and worked in close proximity with an adult mentor for the entirety

of the program. (Def. R. 56.1 Resp. (Dkt. No. 59) ¶ 82; Bate Decl. (Dkt. No. 54) ¶ 9) Every

session at New York Life was conducted in a conference room that had no partitions. (Def R.

56.1 Resp. (Dkt. No. 59) ¶ 85; Bate Decl. (Dkt. No. 54) ¶¶ 8, 10) It is undisputed that "[n]either

[Bate] nor any adult mentor was ever alone with any of the students, or . . . out of view of the

entire group." (Def. R. 56.1 Resp. (Dkt. No. 59) ¶ 87; Bate Decl. (Dkt. No. 54) ¶ 11)

According to Bate, the "female students in the New York Life programs were

often disruptive, misbehaved, and needed to be spoken with to get them to focus on the proper

activity." (Bate Decl. (Dkt. No. 54) ¶ 13) As a part of his social worker training, Bate had

learned that "a pat on the shoulder or upper back can be an effective and appropriate way of

getting the students' attention, and helping them to refocus." (Id. ¶ 14) Bate states that "on

occasion, [he] would touch the students' shoulders or backs to get their attention and try to get

them to focus." (Id. ¶ 15)

**B.**    **The April 24, 2014 Program at New York Life**

C.T., M.J., X.Z, M.M., A.S., and K.M. were all female participants in the Big

Brothers Big Sisters program at New York Life.[4] (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No.

---

[4] Because the complainants were minors at all relevant times, they are referred to in this decision
by the initials of their first and last names.

57) ¶¶ 10-11)  They were in the seventh grade at P.S. 111, and were twelve to thirteen years old in April 2014.  (Id.)

On April 24, 2014, Big Brothers Big Sisters hosted a joint session with both sections of the New York Life program, consisting of approximately twenty students and twenty adults.  (Bate Decl. (Dkt. No. 54) ¶¶ 4-5, 21-22; McGuinness Decl., Ex. A (Bate 50-H Hearing Tr.) (Dkt. No. 52-1) at 11:13-19)  The joint program was held in a large conference room at New York Life's offices at 27 East 27th Street.  (Def. R. 56.1 Resp. (Dkt. No. 59) ¶ 95; McGuinness Decl., Ex. A (Bate 50-H Hearing Tr.) (Dkt. No. 52-1) at 12:18-23)

During the April 24, 2014 program, Bate observed X.Z. using her cell phone, and instructed her to put it away.  (McGuinness Decl., Ex. A (Bate 50-H Hearing Tr.) (Dkt. No. 52-1) at 14:13-23)  According to Bate, X.Z. did not comply and instead plugged her phone in.  (Id. at 15:1-20)  Bate told her that they were "going to have a conversation" because she wasn't listening.  (Id.)  Susan Marcus – X.Z.'s adult mentor – was "standing to the right" of X.Z. during his conversation with X.Z. about the phone.  (Id. at 16:12-16)  Later that afternoon, when Bate approached X.Z. to "address the phone incident," he "placed [his] hands on her shoulder to get her attention."  (Id. at 19:1-9)  X.Z. said, "don't touch me," and Bate "immediately removed [his] hands" and apologized to her.  (Id. at 19-21)

Bate also "reprimanded" A.S. and M.J. that same day, because A.S. "was not waiting her turn to get a snack" and M.J. "was walking in front of the group presentations." (Bate Decl. (Dkt. No. 54) ¶¶ 23-24)

Bate also reprimanded K.M., because she "had not been participating" in the program.  (McGuinness Decl., Ex. B (Bate Dep.) (Dkt. No. 52-2) at 46:11-25)  Bate spoke with K.M. "in an office space."  (Id.)  K.M. was sitting on the floor, and Bate "crouched down to

speak with her." (Id.) K.M. became upset and Bate "thought she was going to leave the room," so he "reached out momentarily" and grabbed her shoe and "then let go." (Id.) Bate stated that K.M.'s Big Sister was "next to [them] when this happened." (Id.)

## C.    Complaints of Inappropriate Touching

On April 25, 2014, C.T., M.J., X.Z, M.M., A.S., and K.M. complained to their school principal about Bate. As discussed in detail below, each girl prepared a handwritten statement stating that Bate had touched, rubbed, and massaged them on their shoulders and/or backs, and that his conduct made them feel uncomfortable. (Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6); Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 32)[5] The written statements included claims that Bate "almost touched C.T.'s breast," that Bate was staring at C.T.'s bottom and underwear while biting his thumb, and that he had rubbed M.J.'s thigh. (See Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 5, DEF 9, DEF 77-78) Bate was placed on administrative duty that same day, and on May 29, 2014, Bate was terminated. (Modafferi Decl., Ex. C (Bate Dep.) (Dkt. No. 48-3) at 19:19-25; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 14)

Shortly after the students made their complaints, a police officer contacted Detective Gerard Sardina and reported that girls "were alleging that somebody sexually abused them." (Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 57:6-25; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 15) At the time, Detective Sardina had been an officer with the Special Victims Unit's Child Abuse Squad for less than six months. (Def. R. 56.1 Resp. (Dkt.

---

[5] Plaintiff admits that the minor complainants made the statements set forth in their handwritten statements, but he disputes the truth of those statements. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶¶ 34, 36-40) The students' handwritten statements are received not for their truth but rather for their effect on Detective Sardina's state of mind.

No. 59) ¶ 108; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 8:22-9:15, 57:6-25)

Detective Sardina had, however, received training on how to conduct a forensic interview of a

minor victim – including methods for assessing the credibility of a young child and determining

whether a witness understands the difference between telling the truth and lying – as well as

child abuse training from the New York State police. (Modafferi Decl., Ex. D (Sardina Dep.)

(Dkt. No. 48-4) at 36:4-24, 38:5-20, 39:23-42:11)  Prior to being assigned to the Special Victims

Unit, Detective Sardina worked in narcotics and as a patrol officer.  (Def. R. 56.1 Resp. (Dkt.

No. 59) ¶ 109; McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 9:16-25)

After receiving the call, Detective Sardina opened a case and initiated an

investigation.  (Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 59:11-22, 60:3-8; see

also Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 26)  Detective Sardina

consulted an Assistant District Attorney in the Manhattan District Attorney's Office, and it was

decided that Sardina would interview all of the people involved in the Big Brothers Big Sisters

program at New York Life who had had contact with the complainants.  (See McGuinness Decl.,

Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 170:9-24)

### D. Detective Sardina's Interviews of Students, Parents, and School Staff and Review of the Minor Complainants' Written Statements

Detective Sardina interviewed three of the minor complainants – X.Z., M.M. and

C.T. – on April 29, 2014, five days after Bate's alleged misconduct.  (See Modafferi Decl., Ex. E

(DD5 Reports) (Dkt. No. 48-5) at DEF 11, 27-28)[6]  X.Z. reported that on April 24, 2014, Bate

---

[6] Plaintiff does not dispute that the minor complainants made the statements set forth in Detective Sardina's reports, but instead disputes the truth of the complainants' statements to Detective Sardina.  (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶¶ 16-25, 31-32, 41-49, 51-53, 58)  As noted above, the complainants' statements are received not for their truth but rather for their effect on Detective Sardina's state of mind.

twice "massaged" her shoulders. (Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 27) On the second occasion, X.Z. told him, "don't touch me." (Id.) X.Z. stated that she "felt uncomfortable when [Bate] was massaging her shoulders," and that "she didn't like [it] when he touched her." (Id.) X.Z. also stated that she had observed Bate looking down C.T.'s pants. (Id.) X.Z. stated that "she did not like Matt from when he took over as program manager." (Id.) Detective Sardina asked X.Z. if Bate had ever touched her any place other than her shoulders, or "said anything to her while he was massaging her," and she said "no." (Id.)

M.M. told Detective Sardina that on April 24, 2014, Bate "massaged her shoulders on at least two occasions."[7] (Id. at DEF 28; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 19) M.M. stated that this was the first time that Bate had touched her, and that it made her "feel uncomfortable." (Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 28) M.M. stated that she did not want to return to the Big Brothers Big Sisters program. (Id.) Detective Sardina asked M.M. if Bate ever touched her any place other than her shoulders, and she said "no." (Id.) When Detective Sardina asked if Bate ever said anything to her while he touched her, M.M. stated that Bate told her "she was doing a good job on her work." (Id.)

C.T. told Detective Sardina that since Bate took over as program director, he had been "massaging her shoulders" and "rubbing her back and neck." (Id. at DEF 11) Bate also "look[ed] down the back of her pants while she was sitting" when her underwear was visible. (Id.) C.T. stated that Bate's conduct made her feel "very uncomfortable." (Id.) C.T. told her

---

[7] Sardina's report states that the massaging occurred on April 24, 2013. (See Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 28) At his deposition, Sardina testified that the reference to 2013 in his report was a typographical error. (Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 85:1-13)

mother about the massaging the first time that it happened, and her mother instructed her to report Bate's conduct to the principal or guidance counselor, but C.T. did not do so. (Id.)

Detective Sardina's report and deposition testimony indicate that C.T. – who was twelve years old at the time of the incident (see id.; Modafferi Decl., Ex. H (Criminal Complaint) (Dkt. No. 48-8)) – told him that, on one occasion when Bate was massaging her shoulders, he was facing her, and "when he put his hands down, he rubbed one of her breasts over her shirt." (Id.; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 93:17-25, 94:13-19) In his handwritten notes of his interview of C.T., however, Detective Sardina wrote, "Thursday before last/poss. touched breasts of C/T while massage from the front." (McGuinness Decl., Ex. Q (Sardina Handwritten Notes) (Dkt. No. 52-17) at 1) When questioned at his deposition about this entry, Detective Sardina denied that C.T. had stated that Bate had "possibly touched" her breast, but he had no explanation for why he had written in his notes that C.T. had said that Bate had "poss. touched breasts of C/T while massage from the front":

> Q.   "Pos[s] touch[ed] breast of [CT] while massage from front." Do you recall what that refers to?
>
> A.   Yes.
>
> Q.   What is that?
>
> A.   That's the description the victim gave to me how Matt touched her.
>
> Q.   Does that refresh your recollection as to what that description was?
>
> A.   Yes.
>
> Q.   What is that?
>
> A.   [C.T.] told me that [Bate] was facing her and massaging her shoulders and he took his hand and rubbed her breast.
>
> Q.   Did she say that he possibly touched her breast?

A.   No.

Q.   Did you write that he possibly touched her breast?

A.   Yes.

Q.   Why did you write possibly touched her breast if she didn't say it?

A.   I don't know.
     . . . .

Q.   Is it possible she said he possibly touched my breast?
     . . . .

A.   No.

Q.   Do you have any explanation as to why you wrote possibly touched breast if the victim was saying he definitely touched her breast?

A.   I don't know how to answer that question.

(McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 97:2-98:12)

At his deposition, Detective Sardina was also asked when during the "Thursday before last" the alleged breast-touching took place:

Q.   The date you stated, April 17, 2014, do you recall [when] during that day he allegedly touched her breast?

A.   I don't.

Q.   Did you ask when?

A.   I did.

Q.   Would that be an important thing to note in your DD-5 [report]?

A.   Yes.

Q.   Did you note it on your DD-5?

A.   I do not see it on here.

Q.   Why did you not note when the breast touching occurred?

A.   I don't know.

(Id. at 98:13-99:4; see also Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 11)

There are other inconsistencies between Detective Sardina's handwritten notes and DD5 reports concerning his interview of C.T. In his handwritten notes, Detective Sardina wrote that the touching happened on the "Thursday before last." (McGuinness Decl., Ex. Q (Sardina Handwritten Notes) (Dkt. No. 52-17) at 1) At his deposition, Detective Sardina testified that "in the context of [his] reporting on April 29, 2014," the date of the "Thursday before last" would be April 17, 2014. (McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 96:1-9) In his closing reports summarizing the investigation, however, Detective Sardina states that the alleged breast touching occurred on April 3, 2014. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74)

During his interview of C.T., Detective Sardina explained to her that her assertion that Bate had touched her breast was very serious and, if her allegation was true, she would have to swear to it in court. (Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 11) Detective Sardina asked C.T. if she knew what an oath was, and C.T. said it was when you swear to tell the truth. (Id.) Detective Sardina then asked C.T. if what she had said was the truth, and C.T. said yes. (Id.) Detective Sardina asked her why she hadn't told her mother about the breast touching, and C.T. explained that she was scared to tell her. (Id.) During the interview, C.T. also told Detective Sardina that "she felt the touching of her lower back and the touching of her breast was sexual."[8] (Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 94:1-16)

Detective Sardina's handwritten notes memorializing his conversation with C.T. list three adults – Taylor Shea, Victoria Brady, and Angela Wong – as possible witnesses to

---

[8] Plaintiff notes that Detective Sardina's DD-5 reports contain no reference to C.T. stating that Bate's conduct was "sexual in nature." (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 26)

Bate's alleged contacts with C.T.[9]  (McGuinness Decl., Ex. Q (Sardina Handwritten Notes) (Dkt. No. 52-17) at 1; McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 99:5-17, 157:16-21 (Detective Sardina testifying that his handwritten notes relate to his interview of C.T. and list Victoria Brady, Taylor Shea, and Angela Wong as possible witnesses))

On April 29, 2014, Detective Sardina also interviewed Ms. Medina – the principal of P.S. 111 – and Ms. Wiles – the school guidance counselor.  (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 32)  Medina told Detective Sardina that on April 25, 2014, six female students had complained that Bate was "touching the students in an inappropriate manner."  (Id.) In response, she contacted the precinct youth officer and initiated an internal investigation.  (Id.) Medina stated that she interviewed the students and asked them to prepare written statements. (Id.)  Wiles told Detective Sardina that the students had complained about Bate massaging and touching their shoulders and backs, and that the students stated that Bate's conduct made them feel "very uncomfortable."  (Id.)

Detective Sardina interviewed C.T.'s mother on April 30, 2014.  (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 30)  C.T.'s mother stated that since Bate took over as program manager in February, C.T. had complained about Bate "massaging her shoulders"

---

[9]  Detective Sardina's handwritten notes contain the following bullet points:

- Victoria / M partial poss. witness.
- Happened before Thursday / massage both shoulders
- Grabbed arm of C/T said he was gonna miss you
- Touched her neck in past and rubbed
- Thursday before last / poss. touch of breast of C.T. while massage from the front.
- Rubbing back + / pulled arm. /
- Taylor Witness Big.
- Angela Wong / Big
- Second or third time.

(McGuinness Decl., Ex. Q (Sardina Handwritten Notes) (Dkt. No. 52-17) at 1)

and "touching her back," and that she had instructed C.T. to report Bate's conduct to the school principal or guidance counselor. (Id.) Detective Sardina told C.T.'s mother that C.T. had told him that Bate had touched her breast. (Id.) C.T.'s mother was surprised, and "stated that [C.T.] never told her that." (Id.) Detective Sardina explained that this was a very serious allegation, and that it was very important that she speak with C.T. in private to ensure that C.T. understood the seriousness of the allegation. (Id.; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 105:5-21) C.T.'s mother agreed to do so. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 30) Later that day, C.T.'s mother called Detective Sardina and left a voicemail stating that she had spoken with C.T., and that C.T. told her that Bate had touched her breast and that she was telling the truth. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 30; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 105:5-21)

On May 6, 2014, Detective Sardina interviewed another minor complainant – M.J. – about the April 24, 2014 Big Brothers Big Sisters program. (Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 149:1-12; Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 40) M.J. – who was twelve years old on April 24, 2014 (see Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 40; Modafferi Decl., Ex. H (Criminal Complaint) (Dkt. No. 48-8)) – told Detective Sardina that she was sitting at a table with her friend J.D. when Bate came over and "placed his hand on her leg near her knee." (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 40) M.J. stated that "she was wearing a skirt," and that Bate "began to rub her leg with his hand," ultimately running his hand up "towards the top part of her leg." (Id.; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 149:1-12) M.J. stated that she "felt very uncomfortable," asked Bate to stop, and that Bate then stopped and apologized to her.

(Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 40)[10] Detective Sardina asked M.J. if

Bate said anything to her "while he was rubbing her knee and leg area," and she responded "no."

(Id.)

### 1. Detective Sardina's Review of the Minor Complainants' Handwritten Statements

On May 9, 2014 – as part of his investigation – Detective Sardina obtained and

reviewed the girls' April 25, 2014 handwritten statements, originally collected by the P.S. 111

school principal. (See Def. R. 56.1 Stmt. (Dkt. No. 49) ¶ 33; Pltf. Resp. to Def. R. 56.1 Stmt.

(Dkt. No. 57) ¶ 33; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 154:4-12;

Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 32, DEF 46; Modafferi Decl., Ex. F

(Written Complaints) (Dkt. No. 48-6))

In her handwritten statement, C.T. wrote:

> [Bate] makes me feel very uncomfortable because he inappropriately touches me, and
> many other girls. This problem did not occur the first few times at [the] program[,] but
> started after a few weeks. He grabs me, rubs me close to my butt. He looked [at] my
> underwear while my friends . . . were telling me to pull up my pants (he was staring). He
> grabs me and [the other girls] . . . a few times. He rubbed [M.J.'s] leg. We told [two
> adult mentors and] they said they notice[d] this. When it was also time to go he grabbed
> me and told me that he was going to miss me. What I wrote here occurred yesterday. I
> felt better when we left because I felt safe again.

(Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 5)

Detective Sardina never asked C.T. why she had not mentioned the breast

touching in her April 25, 2014 handwritten statement. (Modafferi Decl., Ex. D (Sardina Dep.)

(Dkt. No. 48-4) at 215:7-20)  At deposition, Detective Sardina testified that he did not find the

omission unusual, because sex abuse victims' initial disclosures often "leave[] out the main

---

[10] At his deposition, Detective Sardina could not recall whether he had interviewed J.D. – M.J.'s
friend – about the leg touching incident. (McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-
3) at 150:16-25)

event, it happens all the time. . . . [W]hen victims of sex crimes are asked to write written statements by school officials, they are under a lot of pressure and . . . never really give the full story because it[']s embarrassing for them." (Id. at 216:15-25)

In M.J.'s handwritten statement she wrote:

> On Thursday[,] 24th of April[,] Matt our program manager touched my leg and on that day I had a dress on. Then later on that evening I went to blow my nose and he came with me to the hallway and he told me that I was being rude[,] then I said sorry just trying to blow [my] nose. After he reached for my arm[,] then I moved over[,] then he reached for my shoulder [and] then he aggressively grabbed my shoulder like somebody yelled at him.

(Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 9)

In her handwritten statement, X.Z. wrote:

> Yesterday [(April 24, 2014),] at Big Brother Big Sister I felt very uncomfortable around Matt (our program manager) because he has touched me and most of it happened yesterday[,] but also at other program days too. It usually started off with just a pat on the shoulder[,] but then it escalated to rubbing my shoulders[,] which I feel really uncomfortable with. Matt rubbed my shoulders yesterday while I was sitting down but I . . . got[] up quickly and said[,] "please don't touch me! NO CONTACT!" After that he had apologized but it felt like he wasn't sincere[,] and towards the end of the program he had rubbed my shoulders and rubbed my back and it was really uncomfortable. He has also touched other girls and he had rubbed one of the girl's thigh and then he had rubbed C.T.'s shoulder and was close to touching her breast and yesterday K.M. had told C.T. to pull up her pants and us girls had seen Matt behind her looking down at her bottom and biting his thumb. . . .

(Id. at DEF 77)

Detective Sardina never asked X.Z. if she saw Bate touch C.T.'s breast, despite X.Z.'s statement that Bate "was close to touching [C.T.'s] breast." (See id.; McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 184:16-24) At deposition, Detective Sardina explained that, "[f]rom [his] experience, eyewitness testimony and eyewitness accounts of things that occurred are not always 100 percent accurate . . . [so he] take[s] what the victim says as what actually occurred." (McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 185:21-186:2)

In her handwritten statement, A.S. wrote:

[Bate] make[s] me feel uncomfortable. He touches me and other kids. When he talks to us he stands close and rubs our shoulders. Yesterday, I was hungry and the food came late, so I said I was hungry and didn't have breakfast or lunch. He started rubbing my shoulders and when I went to walk away . . . he dug his nail into my shoulder and pulled me back, causing my arm to turn red for the rest of the day. And later . . . I was leaning back in my chair and [he] was behind me [and] he started rubbing on my shoulders again. I've witnessed it happen to other girls too. I don't like this.

(Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 79)

In her handwritten statement, M.M. wrote:

I feel very uncomfortable because [Bate] touches the kid[s] . . . and me inappropri[a]t[e]lly. He did start touching the first twoday [sic], but he touched my friend C.T. and he was rubbing his hand on her shoulder and almost touched her breast. Then yesterday [we] both were together and K.M. told [C.T.] to pull up her [pants] and Matt look[ed] down at C.T. and watched her pull up her pants. Then he started [to] touch the other girls in the group and he injured one of the girls by put[t]ing his fingernails in her skin[,] and he touched [me] on my shoulder and he started rubbing it and I felt really uncomfortable. I was happy when I left and I felt so relieved when we left.

(Id. at DEF 78)

In her handwritten statement,, K.M. wrote:

I felt very uncomfortable with Mat[t]. He rubs my back and is always really close to me. This previous Thursday I was getting upset with Matt[,] because he kept touching my back and my [adult mentor] kept telling me to calm down but yeah he was making me not wanna be there. When we were lining up for food and I told the [adult mentors] (Stephanie and Taylor) and they said they have noticed it too. They started watching Matt. Matt also rubbed my feet because I was mad[].

(Id. at DEF 80)

## 2. Detective Sardina's Additional Interviews of the Minor Complainants and Their Parents

On May 9, 2014, Detective Sardina interviewed A.S., who reported that Bate had touched her shoulders on a few occasions, and had "massaged her shoulders while standing behind her, and while facing her." (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 65) A.S. stated that she felt very uncomfortable when Bate touched her. (Id.) A.S. also stated that

15

on April 24, 2014, Bate was massaging C.T.'s shoulders and rubbing her back. (Id.) Detective Sardina asked if Bate ever touched her anywhere else, and A.S. said "no." (Id.)

On May 10, 2014, Detective Sardina met with C.T. and her mother. (McGuinness Decl., Ex. P (DD5 Reports) (Dkt. No. 52-16) at DEF 54) Detective Sardina asked C.T. if she felt comfortable placing a controlled telephone call to Bate, and C.T. said no, and that she did not want to talk to Bate. (Id.) Detective Sardina then asked C.T.'s mother if she would place the call, and C.T.'s mother agreed. (Id.) They then attempted to call Bate, but could not reach him. (See id.)

On May 13, 2014, Detective Sardina interviewed M.J. for the second time, and asked her to again describe her contact with Bate. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 69) M.J. stated that while she was sitting on a table in the conference room at New York Life, Bate approached her and placed his hand on her leg. (Id.) M.J. repeated that she was wearing a skirt, and that Bate rubbed his hand up and down her leg, towards her thigh. (Id.) Bate's conduct made her feel uncomfortable. (Id.) M.J. reported Bate's conduct to the P.S. 111 school principal and guidance counselor the next day. (Id.)

Detective Sardina interviewed K.M.'s mother on May 14, 2014. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 70) K.M.'s mother told Detective Sardina that K.M. told her that Bate had rubbed her shoulders and back in the past, and that it "made her uncomfortable." (Id.) K.M.'s mother also stated that K.M. told her that Bate "touches the other girls as well." (Id.) K.M.s mother told Detective Sardina that she instructed K.M. to tell the other girls to report Bate's conduct to someone at P.S. 111, and that the girls subsequently did so. (Id.; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 232:19-25) On April 25, 2014, K.M.'s mother received a telephone call from the school, asking her to come in for a meeting to

discuss the issues with Bate. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 70).

K.M.'s mother stated that she told the girls that they were making very serious allegations about

Bate, but that the girls had told her "that they were all telling the truth." (Id.)

On May 15, 2014, Detective Sardina interviewed K.M. (Id. at DEF 71) Detective

Sardina asked her why she had decided to tell the principal about the incident at the Big Brother

Big Sister program. (Id.) K.M. said that she told her mom that all of the girls had discussed how

Bate's conduct was making them feel, and that her mom instructed her to "get the girls together

and go to school staff." (Id.)

K.M. explained that Matt rubbed her shoulders and her back during the program,

and that "she didn't like it." (Id.; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at

235:1-13) During a workshop for the program, while K.M. was sitting on the floor, Bate

grabbed her foot and started rubbing it with his thumb. (Id.)

C.T. had told K.M. that Bate was "touching her back and shoulders all the time,"

(Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 71), and on April 24, 2014, K.M. saw

Bate standing behind C.T. and staring at her underwear. (Id.) K.M. told C.T. to pull up her

pants. (Id.) K.M. said that she "thought it was wrong" that Bate was looking at C.T.'s

underwear. (Id.)

Detective Sardina asked K.M. if everything she was saying was the truth, and

K.M. said, "I am telling the truth." (Id.; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4)

at 235:1-15)

### E. Detective Sardina's Interviews of Big Brothers Big Sisters Staff and Adult Mentors

On April 29, 2014, Detective Sardina interviewed Hector Bautista, the Director of

Big Brothers Big Sisters of New York City. (McGuinness Decl., Ex. D (DD5s) (Dkt. No. 52-4)

at DEF 31) Bautista told Detective Sardina that after he was informed of the girls' allegations, he placed Bate on administrative leave. (Id.) Bautista questioned Bate about massaging the girls' shoulders and touching their backs, and Bate stated that he only touched the girls' shoulders as a technique to get them to focus.[11] (Id.; see also Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 251:13-17)

On April 30, 2014, Detective Sardina interviewed Taylor Shea, M.M.'s Big Sister. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 34) Shea stated that she had observed Bate put his hands on several of the girls' shoulders and backs. (Id.) When Detective Sardina asked if she ever observed Bate massage the girls' shoulders, Shea said that it was "more like squeezing," and that it made the girls "uncomfortable." (Id.; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 54) Shea described Bate as a "'touchy feely' guy" (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 34; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 55), and commented "that the female students were particularly rowdy that year." (Shea Decl. (Dkt. No. 55) at 10) "[W]hen the girls were acting out, talking or being disruptive, Bate would always put his hands on their shoulder or rub their backs." (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 34; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 54) Shea and the other Big Sisters "discussed telling the other staff members [about Bate's conduct], but [then] this incident happened, and they did not get the chance." (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 34; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 56)

---

[11] Defendants object to this evidence as hearsay. (See Def. R. 56.1 Statement (Dkt. No. 49) ¶ 128) The evidence is not being considered for its truth, however, but rather for its effect on Detective Sardina's state of mind. See, e.g., DeNigris v. New York City Health & Hosps. Corp., 552 F. App'x 3, 6 (2d Cir. 2013) ("Where statements are offered to show their effect on a listener's state of mind, they are not hearsay." (citations omitted)); Davis v. City of New York, 959 F. Supp. 2d 427, 436 (S.D.N.Y. 2013) (statements by arrestees and witnesses were admissible to show their effect on the arresting officer's state of mind).

On April 30, 2014, Detective Sardina interviewed Stephanie Lopez, K.M.'s Big

Sister. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 35)  The parties dispute, in part,

what Lopez said to Detective Sardina.  According to Detective Sardina's report, Lopez stated

that she had been "oblivious" to Bate at the time, but looking back at his behavior, he "did touch

the girls a lot" and "would rub their shoulders."  (Id.)

Plaintiff has submitted a declaration from Lopez, however, in which she states

that she told Detective Sardina that she "had seen Matthew touch the students' shoulders, but that

[she] didn't find it to be inappropriate." (Lopez Decl. (Dkt. No. 53) ¶ 14)  Lopez says that she

told Detective Sardina that "Matthew touched the students' shoulders when they were being

disruptive to get their attention." (Id. ¶ 15)[12]

Detective Sardina's report contains additional information obtained from Lopez,

however, which she does not address in her declaration.  According to Detective Sardina, Lopez

stated that K.M. had told her that "Bate [had] touched C.T . . . possibly on her breast," "[b]ut

[that] [K.M.] wasn't sure." (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 35; Pltf.

Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 58)  Lopez then approached C.T. and asked her what

happened, and C.T. told Lopez that "when Bate touches her shoulders, she feels uncomfortable."

(Id.; Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 136:7-13)

---

[12]  In her declaration, Lopez also states that K.M. "did not like [Bate] because when she would
disrupt programs, speak on her cell phone or otherwise misbehave, [Bate] would call her out on
her behavior." (Id. ¶ 8)  Lopez also states that K.M. was in a "solid clique of girls in the program
that included [M.J. and M.M]." (Id. ¶ 9)  Lopez does not state in her declaration that she ever
reported this information to Detective Sardina, however. (Id.)  Because this Court's "inquiry is
limited to whether the facts known by the arresting officer at the time of the arrest objectively
provided probable cause to arrest," Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir.
2013), these assertions in Lopez's declaration are irrelevant.

On May 7, 2014, Detective Sardina interviewed Victoria Brady, M.J.'s Big Sister. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 42; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 59) Brady stated that she was not at the Big Brothers Big Sisters program on April 24, 2014. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 42) Brady also stated that Bate was "strict with the group," and "often touche[d] the girls when they [we]re not listening or acting out." (Id.) Brady "explained that [Bate] would put his hands on the girls' shoulders to calm them down." (Id.) Brady had seen Bate put his hands on C.T.'s shoulders and noticed "that C.T. looked uncomfortable," but "C.T. never said anything to her about feeling uncomfortable." (Id.; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 60)

Between May 7, 2014 and May 13, 2014, Detective Sardina interviewed a large number of other adult mentors in the Big Brothers Big Sisters program, including Kevin Libby, Siu Kay Lee, Katherine Carden, Mutha Kuttaiyan, Gabrielle Brochard, Adam Feit, Jennifer Roy Angela Wong, Daniel Dunkelburger, Jennifer Phillips, and Melissa Miller. (McGuinness Decl., Ex. E (DD5s) (Dkt. No. 52-5) at DEF 43, Ex. F (DD5s) (Dkt. No. 52-6) at DEF 44, Ex. I (DD5s) (Dkt. No. 52-9) at DEF 49, Ex. J (DD5s) (Dkt. No. 52-10) at DEF 50, Ex. K (DD5s) (Dkt. No. 52-11) at DEF 51, Ex. L (DD5s) (Dkt. No. 52-12) at DEF 52, Ex. M (DD5s) (Dkt. No. 52-13) at DEF 53, Ex. N (DD5s) (Dkt. No. 52-14) at DEF 67, Ex. O (DD5s) (Dkt. No. 52-15) at DEF 68) Most of these mentors had not seen Bate inappropriately touch female students, and no student reported to these mentors that Bate had touched them inappropriately.

Kevin Libby told Detective Sardina that "other than a hand on a girls' shoulder, he did not see anything that he thought was inappropriate." (McGuinness Decl., Ex. E (DD5 Report) (Dkt. No. 52-5) at DEF 43) No student reported to Libby that Bate was acting inappropriately. (Id.)

Siu Kay Lee, A.S.'s Big Sister, reported that "she observed [Bate] touching [the] girls' shoulders and massaging their shoulders," and she stated that Bate "may have massaged or touched the shoulders of A.S." (Id., Ex. F (DD5s) (Dkt. No. 52-6) at DEF 44) This "only happened when the girls were acting out or no[t] listening to [Bate]," however, and "none of the girls complained to her about the touching." (Id.)

Katherine Carden told Detective Sardina that she "never really thought [Bate's] conduct was out of the ordinary." (Id., Ex. G (DD5s) (Dkt. No. 52-7) at DEF 45) "[W]hen the girls in the program were acting out, [Bate] would put his hands on some of the girls' shoulders." (Id.) She never observed Bate massage the girls' shoulders, and none of the girls ever told her that Bate had touched them inappropriately. (Id.)

Mutha Kuttaiyan told Detective Sardina "he did not observe [Bate] touch any of the students," and "was never told by any of the students that [Bate] was touching anyone in an inappropriate manner." (Id., Ex. H (DD5s) (Dkt. No. 52-8) at DEF 48)

Gabrielle Brochard told Detective Sardina that she had observed Bate "pat the kids in the program on the back," but had never observed him massage the girls' backs. (Id., Ex. I (DD5s) (Dkt. No. 52-9) at DEF 49) On April 24, 2014, she observed Bate and K.M. in conversation, and "K.M. looked upset because [Bate] had just reprimanded her for something." (Id.)

Adam Feit told Detective Sardina that he had never observed Bate touch any of the girls in the program. (Id., Ex. J (DD5s) (Dkt. No. 52-10) at DEF 50) He also stated that none of the students had reported any touching to him. (Id.)

Jennifer Roy told Detective Sardina that she had never seen Bate massage or touch the shoulders of the girls in the program, and that "she never observed anything that she

thought was inappropriate." (Id., Ex. K (DD5s) (Dkt. No. 52-11) at DEF 51) No student ever told Roy that they felt uncomfortable with Bate. (Id.)

Angela Wong, C.T.'s Big Sister, told Detective Sardina that she could not recall whether Bate had touched or massaged C.T. or any other student. (Id., Ex. L (DD5s) (Dkt. No. 52-12) at DEF 52; Def. R. 56.1 Resp. (Dkt. No. 59) ¶¶ 169-71) No student reported to Wong that Bate made them feel uncomfortable. (McGuinness Decl., Ex. L (DD5s) (Dkt. No. 52-12) at DEF 52)

Daniel Dunkelburger told Detective Sardina that he had observed Bate touch the students' shoulders, but had not observed any massaging. (Id., Ex. M (DD5s) (Dkt. No. 52-13) at DEF 53) Dunkelburger did not regard the touching he observed as inappropriate. (Id.)

Jennifer Phillips told Detective Sardina that she did not recall any inappropriate behavior involving Bate, and that none of the students or staff had ever brought to her attention that Bate was acting inappropriately. (Id., Ex. N (DD5s) (Dkt. No. 52-14) at DEF 67; id., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 220:1-9)

Melissa Miller told Detective Sardina that she never saw Bate acting inappropriately with any of the students, and that neither her Little Sister nor any New York Life employee had every reported to her that Bate had engaged in inappropriate behavior. (Id., Ex. O (DD5s) (Dkt. No. 52-15) at DEF 68)

It is undisputed that none of the adult mentors observed Bate touch C.T.'s breast. (Def. R. 56.1 Statement (Dkt. No. 49) ¶ 61; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 61)

None of the adult mentors told Detective Sardina that the female students disliked Bate, or that Bate excessively reprimanded them. (Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 191:11-18)

**F.     Detective Sardina's Evaluation of the Evidence, His Closing
Reports, the Criminal Complaint, and Plaintiff's Arrest**

Detective Sardina regarded all of Bate's touching as inappropriate, because "each child described that they were being touched inappropriately and [that] they were uncomfortable." (McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 116:8-25) Detective Sardina explained that "pubescent girls . . . don't like to be touched by anyone, especially a male," so all of Bate's touching was inappropriate. (Id. at 116:20-117:2) Detective Sardina testified that he did not believe that Bate's actions with respect to X.Z. and M.M. constituted a crime, (id. at 117:3-118:19), but Detective Sardina believed that Bate's touching of C.T. and M.J. constituted "sex abuse." (Id. at 117:3-19) He also testified that he believed Bate's touching of the girls' shoulders affected their moral well-being. (Id. at 250:25-251:7)

Detective Sardina never asked the girls whether they "had a reason to fabricate a story about [Bate] touching them." (Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 191:19-22) He found C.T. and M.J. credible, and he believed that all six girls were telling the truth. (Id. at 74:21-75:2, 225:16-25, 263:10-23)

Detective Sardina also testified that – from his experience on the Child Abuse Squad – Bate's conduct was consistent "with what most child molesters do, which is called grooming." (Id. at 252:1-25) In explaining what led him to believe that Bate's conduct was "grooming as opposed to innocent touching," Detective Sardina stated that "[t]he girls explained to me [that they] were very uncomfortable with his touching and on two of the girls it raised to the level of sexual, the touching of the breast and the touching of leg area," and "[o]ne of the girls said [Bate] was staring at the underwear of the girls . . . this is classic grooming." (Id. at 252:13-25; Modafferi Decl., Ex. 1 (Sardina Dep.) (Dkt. No. 58-1) at 253:1-22)

On May 28, 2014, Detective Sardina prepared closing reports concerning the incidents involving M.J. and C.T. (McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 245:5-246:9; Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74) The closing reports provide a broad summary of Detective Sardina's entire investigation. (See Def. R. 56.1 Resp. (Dkt. No. 59) ¶ 193; McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 245:5-17; Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74)

In his closing reports, Detective Sardina states that "six female students" told their school principal that "Bate had been touching them on their shoulders and backs on numerous occasions," and that all six girls had "prepared written statements to the school detailing what happened." (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74) He wrote that, of the six students who complained, "[o]nly two of the victim[s] alleged sexual conduct" – C.T. and M.J. (Id.) He explains that C.T. claimed that Bate had "touched her breast over her clothing on 04/03/2014," and that M.J. claimed "that [Bate] had rubbed her thigh while she was wearing a skirt on 04/24/2014." (Id.) Detective Sardina discloses that while C.T.'s mother was aware of the "shoulder massaging and back rubs," she "was not aware of the touching of her daughter's breast." (Id.)

Detective Sardina explained that he had obtained from the Director of Security at New York Life a list of New York Life employees who had participated in the Big Brothers Big Sisters program, and that he spoke with "each individual employee" whose name was on that list. (Id.) Detective Sardina states in his reports that "the group of [New York Life] employees that worked on the Thursday program corroborated the statements from students about [Bate] touching the girls inappropriately." (Id.)

24

Detective Sardina provided all of his reports to the District Attorney's Office, and conferred with the District Attorney's Office about the case. (See Modafferi Decl., Ex. 1 (Sardina Dep.) (Dkt. No. 58-1) at 171:6-24, 244:8-19; Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74) In his closing reports, Detective Sardina states that the District Attorney's Office had interviewed C.T. and M.J., and then decided to move forward with prosecution. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74)

On May 28, 2014, Assistant District Attorney Colleen Walsh of the New York County District Attorney's Office issued a criminal complaint charging Bate with two counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(4)), and six counts of Endangering the Welfare of a Child (N.Y. Penal Law § 260.10(1)). (See Modafferi Decl., Ex. H (Criminal Complaint) (Dkt. No. 48-8); Def. R. 56.1 Resp. (Dkt. No. 59) ¶ 201) Detective Sardina swore out the complaint, and he arrested Bate. (Modafferi Decl., Ex. H (Criminal Complaint) (Dkt. No. 48-8); Modafferi Decl., Ex. G (Arrest Report) (Dkt. No. 48-7)) The Criminal Complaint states, inter alia, that "at the times and places described below in the County and State of New York, the defendant subjected another person to sexual contact when the other person was less than thirteen years old and the defendant was twenty-one years old and older; the defendant knowingly acted in a manner likely to be injurious to the physical, mental, and moral welfare of a child less than seventeen years old." (Modafferi Decl., Ex. H (Criminal Complaint) (Dkt. No. 48-8) at 1)

In the Criminal Complaint, Detective Sardina sets forth the following factual basis for the charges:

(1)    that he was informed by C.T. that "on or about April 3, 2014, at 27 East 27th Street, 1st floor, defendant touched [her] breast over her clothing";

(2)    that he was informed by M.J. that "on or about April 24, 2014, at 27 East 27th Street, 1st floor, defendant rubbed [her] thigh over her clothing"; and

(3)    that he was informed by A.S., C.T., K.M., M.J., M.M., and X.Z that "on numerous occasions at 27 East 27th Street, 1st floor . . . defendant rubbed each girl's shoulders."

(Id.)

### G.    The District Attorney's Decision to Drop All Charges

Around July 18, 2014, Bate met with Assistant District Attorney Walsh, who had issued the criminal complaint against him.  (McGuinness Decl., Ex. B (Bate Dep.) (Dkt. No. 52-2) at 7:16-23; Bate Decl. (Dkt. No. 54) ¶ 27; see also Modafferi Decl., Ex. H (Criminal Complaint) (Dkt. No. 48-8))  Bate explained to ADA Walsh that "any contact [he] had with the students was to get their attention or help them regain focus and it was consistent with [his] training as a social worker."  (Bate Decl. (Dkt. No. 54) ¶ 28)

On October 2, 2014, ADA Walsh moved to dismiss all charges against Plaintiff.  (McGuinness Decl., Ex. U (Dismissal Tr.) (Dkt. No. 52-21) at 2; Bate Decl. (Dkt. No. 54) ¶ 29)  ADA Walsh told the court that her investigation had "included ordering records, interviewing the defendant with defense counsel present, investigating material and documentation provided by the defendant and defense counsel, and finally interviewing the complainant."  (McGuinness Decl., Ex. U (Dismissal Tr.) (Dkt. No. 52-21) at 2)  ADA Walsh further stated that the "People are moving to dismiss because we have determined that we can not prove this case beyond a reasonable doubt because the People found no evidence of criminal conduct."  (Id.)  The charges against Bate were then ordered dismissed and sealed.  (See id. at 2-3)

## II.    PROCEDURAL HISTORY

The Complaint was filed on April 3, 2015, and asserted claims against the City of

New York, the New York City Police Department, Detective Sardina, the New York County

District Attorney's Office, and ADA Walsh under Section 1983 and New York state law.  (See

Cmplt. (Dkt. No. 2))  The claims were premised on false arrest; malicious prosecution; assault;

battery; intentional infliction of emotional distress; negligent infliction of emotional distress;

negligent hiring, retention, training, and supervision; and respondeat superior liability as to the

state law claims.  (Cmplt. (Dkt. No. 2) ¶¶ 37-75)

The First Amended Complaint ("FAC") was filed on April 20, 2015, against the

same defendants.  (See FAC (Dkt. No. 5))  The claims remained the same, except for the

addition of a Monell claim against the City.  (Id. ¶¶ 76-81)

In a July 29, 2015 letter, Plaintiff withdrew all claims against the New York City

Police Department, the New York County District Attorney's Office, and ADA Walsh.  (Pltf.

Ltr. (Dkt. No. 16) at 2)  On July 30, 2015, the Court dismissed those claims.  (Order (Dkt. No.

17))

On August 6, 2015, Plaintiff filed the Second Amended Complaint ("SAC"),

alleging the same claims listed above, but solely as against the City and Detective Sardina. (SAC

(Dkt. No. 19))  On October 19, 2015, the City and Detective Sardina moved to dismiss the SAC

for failure to state a claim.  Defendants argued that "(1) the victims' complaints provided

probable cause for Plaintiff's arrest, (2) Plaintiff cannot satisfy the elements of a malicious

prosecution, (3) Detective Sardina is entitled to qualified immunity, (4) Plaintiff cannot state a

viable Monell claim against the City of New York, and (5) Plaintiff's claims pursuant to New

York State law fail as a matter of law." (Mot. to Dismiss (Dkt. No. 21); Def. Br. (Dkt. No. 23) at

11-12)  On August 26, 2016, this Court granted Defendant's motion to dismiss Plaintiff's claims

for (1) negligent hiring, retention, training and supervision; (2) intentional infliction of emotional

distress; (3) negligent infliction of emotional distress; and (4) municipal liability under <u>Monell</u>.

Defendants' motion was otherwise denied.  (Order (Dkt. No. 26) at 26)

Pending before the Court is Defendants' motion for summary judgment.

Defendants contend that they are entitled to summary judgment because "the complaints of the

victims provided probable cause for the arrest and prosecution of plaintiff"; and "Detective

Sardina is entitled to the defense of qualified immunity."  (Mot. (Dkt. No. 47) at 1)

**DISCUSSION**

**I.      SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted where the moving party shows that "there is no

genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A fact is considered material "if it 'might affect the outcome of the suit

under the governing law,'" and a dispute about an issue of fact is genuine "where 'the evidence is

such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Holtz v.

Rockefeller & Co. Inc.</u>, 258 F.3d 62, 69 (2d Cir. 2001) (quoting <u>Anderson v. Liberty Lobby Inc.</u>,

477 U.S. 242, 248 (1986)); <u>see also</u> <u>Beyer v. County of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008)

(same).  "When no rational jury could find in favor of the nonmoving party because the evidence

to support [his] case is so slight, there is no genuine issue of material fact and a grant of

summary judgment is proper."  <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219,

1224 (2d Cir. 1994) (citing <u>Dister v. Cont'l Grp., Inc.</u>, 859 F.2d 1108, 1114 (2d Cir. 1988)).

"'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to

preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue

for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II.    FALSE ARREST

Defendants argue that they are entitled to summary judgment on Plaintiff's claims under Section 1983 and New York state law for false arrest, because Detective Sardina had probable cause to arrest Plaintiff, based on the victims' complaints and the other information he obtained during his investigation. (Def. Br. (Dkt. No. 50) at 8, 11)

### A.    Probable Cause

"'The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.'" Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)) (internal quotation marks and citations omitted)). "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and

29

. . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006). "A plaintiff can be said to suffer . . . damages only if the arrest itself, and not any individual charge, is not supported by probable cause." Id. Accordingly, "when faced with a claim for false arrest, we focus on the validity of the arrest, and not on the validity of each charge." Id. (emphasis in original).

      "'[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Id. (footnote omitted) (quoting Weyant, 101 F.3d at 852) (alteration in Jenkins). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as [p]robable cause does not require absolute certainty." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis in original) (internal quotations and citations omitted); Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." (internal quotation marks and citation omitted)).

      Probable cause is evaluated based on the "totality of the circumstances," and "should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." Stansbury v. Wertman, 721 F.3d 84, 93 (2d Cir. 2013) (quoting Panetta, 460 F.3d at 395). Courts should keep in mind, however, that "[p]robable cause is a 'fluid' standard that 'does not demand hard certainties or mechanistic inquiries'; nor does it 'demand that an

officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false.'" Figueroa v. Mazza, 825 F.3d 89, 99 (2d Cir. 2016) (internal quotations and citations omitted). "Rather, it requires only facts establishing 'the kind of fair probability' on which a 'reasonable and prudent' person, as opposed to a 'legal technician[],' would rely." Id. (citations omitted).

"An arresting officer advised of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995); see also Jean v. City of New York, No. 09 CV 801 (RJD), 2011 WL 4529634, at *4 (E.D.N.Y. Sept. 28, 2011) ("Unless there are ''circumstances that raise doubt as to the victim's veracity,' a victim's report of a crime is generally enough, by itself, to establish probable cause.'" (quoting Koester v. Lanfranchi, 288 F. App'x 764, 766 (2d Cir. 2008)). "'The most common situation in which such doubts arise is when there exists a prior [bitter] relationship between the victim and the accused that gives rise to a motive for a false accusation.'" DiStefano v. Sedita, No. 11 Civ. 1125 (MKB), 2014 WL 349251, at *4 (E.D.N.Y. Jan. 31, 2014) (quoting Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998)).

Where there are circumstances that give rise to doubts as to the victim's veracity, "'the officer may need to investigate further.'" Hart v. City of New York, No. 11 Civ. 4678 (RA), 2013 WL 6139648, at *5 (S.D.N.Y. Nov. 18, 2013) (quoting Sankar v. City of N.Y., 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012)). Even in such circumstances, however, an officer's "further inquiry and corroboration of the facts" will be "sufficient to dispel concerns about [the victim's] veracity." Id. Moreover, "the probable cause standard does not require that the arresting officer affirmatively seek out reasons to doubt the victim or witness where none are

apparent." <u>Parisi v. Suffolk Cty.</u>, No. 04 Civ. 2187 (ENV) (ETB), 2009 WL 4405488, at *7

(E.D.N.Y. Nov. 30, 2009).

### B. Elements of Sexual Abuse in the First Degree and Endangering the Welfare of a Child Less Than 17

Bate was arrested and charged with two counts of Sexual Abuse in the First

Degree, N.Y. Penal Law § 130.65(4), and six counts of Endangering the Welfare of a Child

Than 17, N.Y. Penal Law § 260.10(1). (<u>See</u> Modafferi Decl., Ex. H (Criminal Complaint) (Dkt.

No. 48-8) at 1)

Under N.Y. Penal Law § 130.65(4), a person "is guilty of sexual abuse in the first

degree when he or she subjects another person to sexual contact . . . [w]hen the other person is

less than thirteen years old and the actor is twenty-one years old or older." "Sexual contact," in

turn, is defined as "any touching of the sexual or other intimate parts of a person for the purpose

of gratifying sexual desire of either party." N.Y. Penal Law § 130.00(3). New York courts have

construed "sexual contact" broadly to include a kiss on the mouth, touching of the upper leg and

thigh, and touching of a minor's breast. <u>See</u> <u>James v. Mukasey</u>, 522 F.3d 250, 258 (2d Cir.

2008) (noting that New York's definition of "sexual contact" is broader than the federal statute's

definition of sexual contact); <u>United States v. Romeo</u>, 385 F. App'x 45, 49 (2d Cir. 2010) ("New

York courts have held that the upper leg and upper thigh are intimate parts within the meaning of

the [sexual abuse] statute." (collecting cases)); <u>People v. Morbelli</u>, 144 Misc. 2d 482, 484 (New

York Cty. Crim. Ct. 1989) (alleged touching of victim's leg and thigh constituted sexual contact

under N.Y. Penal Law § 130.00(3)); <u>Rodriguez v. Smith</u>, No. 10 Civ. 8306 (KMK) (LMS), 2015

WL 6509153, at *10 (S.D.N.Y. Oct. 28, 2015) (denying habeas petition where the prosecution

offered evidence that the defendant touched the victim's breasts). Moreover, "[t]he required

purpose to gratify sexual desire can be inferred from the circumstances of the conduct." <u>Romeo</u>,

385 F. App'x at 49 (citations omitted); In re Najee A., 26 A.D.3d 258, 258-59 (1st Dept. 2006) ("The sexual gratification element could be readily inferred from appellant's conduct."); see also People v. Teicher, 52 N.Y.2d 638, 646 (1981) (rejecting "defendant's contention that the touching was too fleeting to establish the element of sexual gratification," because the "statute does not require that actual gratification occur, but only that the touching be for that purpose").

Under N.Y. Penal Law § 260.10(1), a person "is guilty of endangering the welfare of a child when . . . [h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old."

The scope of this statute is quite broad. As an initial matter, "[a]ctual harm to the child need not result for criminal liability; it is 'sufficient that the defendant act in a manner which is likely to result in harm to the child.'" People v. Johnson, 95 N.Y.2d 368, 371 (2000) (emphasis in original). "Endangering the welfare of a child is [also] a crime which may be characterized as a continuing offense over time, and does not necessarily contemplate a single act" – meaning that a series of acts, insufficient in isolation, may in combination make out a crime. People v. Simmons, 92 N.Y.2d 829, 831 (1998); Guzman v. Holder, 340 F. App'x 679, 681 (2d Cir. 2009) ("'[A] defendant may be guilty of this crime by virtue of a series of acts, none of which may be enough by itself to constitute the offense, but each of which when combined make out the crime.'" (quoting People v. Keindl, 68 N.Y.2d 410, 421 (1986))). Moreover, "[t]he harm to which the statute refers [under sub-section 1 may be] 'physical, mental or moral.'" Doe by & through Doe v. E. Irondequoit Cent. Sch. Dist., No. 16 Civ. 6594 (CJS), 2018 WL 2100605, at *2 (W.D.N.Y. May 7, 2018) (alterations in original) (quoting People v. Noce, 24 Misc. 3d 1202(A), *5 (Nassau Cty. Dist. Ct. 2009)).

Accordingly, a wide variety of conduct has been found to violate Penal Law

§ 260.10(1).  As the Second Circuit has noted,

> New York's highest court has held . . . that the provision applies to the assault of a mother in front of her children, Johnson, 95 N.Y.2d 368, 718 N.Y.S.2d 1, 740 N.E.2d 1075; and also to the possession of a large number of firearms and ammunition in easy reach of a child known to have played with the guns, People v. Hitchcock, 98 N.Y.2d 586, 750 N.Y.S.2d 580, 780 N.E.2d 181 (2002).  Lower courts in New York have found actual or attempted violations of § 260.10 where a defendant smoked marijuana in his home in the presence of children, People v. Alvarez, 20 Misc.3d 606, 860 N.Y.S.2d 745 (N.Y. Crim. Ct. 2008); where a defendant sold fireworks to a child, People v. Suquisupa, 167 Misc.2d 109, 637 N.Y.S.2d 302 (N.Y.Sup.Ct.1996); where a defendant left a seven-year-old alone in a locked apartment for two-and-one-half hours, People v. Watson, 182 Misc.2d 644, 700 N.Y.S.2d 651 (N.Y.Crim.Ct.1999); where a school bus attendant failed to awaken a child who had fallen asleep and remove him from the bus when it reached the school, People v. Afia, 17 Misc.3d 734, 843 N.Y.S.2d 906 (N.Y. Crim. Ct. 2007); where a father drove drunk with his son in the vehicle, People v. D'Ambrosia, 192 Misc.2d 560, 746 N.Y.S.2d 556 (N.Y.Just.Ct.2002); where defendants lived with their children in filthy, garbage-filled households, People v. Manon, 226 A.D.2d 774, 640 N.Y.S.2d 318 (N.Y. App. Div. 1996); People v. Ambers, 17 Misc.3d 278, 840 N.Y.S.2d 533 (N.Y.Crim.Ct.2007); and where a mother left her two young children unsupervised in an automobile for over two hours, People v. Cenat, 176 Misc.2d 39, 671 N.Y.S.2d 578 (N.Y.Crim.Ct.1997).

Guzman, 340 F. App'x at 681.

New York courts have also applied the statute to "inappropriate physical contact," see, e.g., People v. Toft, 156 A.D.3d 1234, 1235 (3d Dept. 2017) (upholding conviction for endangering the welfare of a child based on "inappropriate physical contact," even though the jury acquitted the defendant of sex crimes); People v. Strickland, 78 A.D.3d 1210, 1211 (3d Dept. 2010) (upholding conviction for endangering the welfare of a child based on proof of the defendant "supplying alcohol to the victim" and blowing marijuana smoke "into the victim's mouth"; noting that the jury could also have concluded that "some impermissible conduct occurred between [the] defendant and the victim," even though defendant was acquitted of sex abuse charges); People v. Sanderson, 68 A.D.3d 1716, 1717 (4th Dept. 2009) ("[A] rational jury could have found that defendant 'knowingly act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of [the] child', based on testimony that, inter alia, defendant

attempted to kiss the victim while he was alone with her.")

C. **Analysis**

Six female students – twelve to thirteen years old – filed written complaints with their school alleging that Bate was touching them "in an inappropriate manner," and that his touching made them feel "very uncomfortable." (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 32; Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6); Pltf. 56.1 Counterstmt. (Dkt. No. 57) ¶ 10) According to the girls, Bate grabbed them; rubbed C.T. "close to [the] butt"; almost touched C.T.'s breast; rubbed M.J.'s thigh; rubbed K.M.'s foot; and rubbed and massaged the girls' shoulders and backs repeatedly, in spite of their protests. (See Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 5, DEF 9, DEF 77, DEF 79) These allegations were reported to the police, and Detective Sardina was assigned to investigate. (See Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 57:6-25, 59:11-22; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 15).

Detective Sardina interviewed each of the six female students who made the written complaints. (See Def. R. 56.1 Statement (Dkt. No. 49) ¶¶ 16-17, 19, 20, 41, 51; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶¶ 16-17, 19, 20, 41, 51) The girls repeated to Detective Sardina that Bate had "massaged" and "rubbed" their shoulders, back, or neck, that they "didn't like it," and that Bate's touching made them feel uncomfortable. (See Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 27, DEF 28, DEF 11, DEF 65, DEF 71)

Several of the girls asked Bate to stop touching them. For example, X.Z. told Detective Sardina that on April 25, 2014 – after Bate tried to "massage[]" her shoulders for a second time – she told Bate, "don't touch me." (Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 27) X.Z. reported that even after she had asked Bate to stop touching her, he

35

continued to rub her shoulders and back. (See Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 77) M.J. likewise reported that on April 24, 2014, Bate placed his hand on her leg near her knee while she was wearing a skirt and began rubbing his hand up and down her leg, towards her thigh. [13] (See Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 40, DEF 69) M.J. stated that she "felt very uncomfortable," and asked Bate to stop. (Id. at DEF 40)

K.M. told Detective Sardina that during one of the program's workshops, she was sitting on the floor and Bate "came over to her and grabbed [her] foot[,]" and started "rubbing [it] with his thumb." (Id. at DEF 71; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 52) C.T., X.Z., and K.M. all complained that Bate had been "looking down the back of [C.T.'s] pants while she was sitting" and staring at her underwear, and C.T. reported that "when [Bate] put his hands down [after massaging her shoulders on one occasion], he rubbed one of her breasts over her shirt." (Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 11, DEF 27, DEF 71; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶¶ 18, 20-21, 52)

On May 9, 2014, Detective Sardina obtained the girls' April 25, 2014 written statements – submitted to their school principal – which were largely consistent with the individual accounts the girls had provided in their interviews with Detective Sardina. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 33; Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 32, DEF 46; Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6))

---

[13] Although Plaintiff denies that M.J. told Detective Sardina that Bate ran his hand up her leg towards her thigh (see Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶ 31), he has cited no evidence to the contrary. Instead, Plaintiff argues that Detective Sardina's deposition testimony provides the only support for this allegation, which purportedly is not found in Sardina's reports. (Id.) Plaintiff's assertion is incorrect. M.J.'s statement that Bate rubbed his hand up and down her leg – towards her thigh – is memorialized in Detective Sardina's report documenting his May 13, 2014 interview of M.J.. (See Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 69)

Detective Sardina also interviewed the mothers of the girls, who confirmed that the girls had complained about Bate's unwanted touching. For example, K.M.'s mother confirmed that K.M. had complained that Bate rubbed her shoulders and back, that his conduct made her uncomfortable, and that he touched other girls as well. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 70) K.M.'s mother told K.M. to complain to her school, and urged her to convince the other girls to complain as well. (Id.) CT's mother likewise confirmed that her daughter had complained about Bate massaging her shoulders and back. CT's mother told C.T. to report Bate's conduct to the school principal or a guidance counselor. (Id. at DEF 30)

Bate does not dispute that the allegations that he touched C.T.'s breast and rubbed M.J.'s thigh would support a charge of Sexual Abuse in the First Degree, nor does he contest that this same conduct – considered together with the allegations of massaging and rubbing the girls' backs, shoulders, neck, and feet without their consent – would support a charge of Endangering the Welfare of a Child Less Than 17. Instead, Bate contends that Detective Sardina should have realized that the six girls and their mothers had formed a conspiracy to falsely accuse Bate of misconduct. (See Pltf. Br. (Dkt. No. 56) at 16-27

In support of this outlandish theory, Bate cites the following alleged evidence:

Detective Sardina had "awareness of a bitter relationship" between the girls and Plaintiff that gave the girls a motive to falsely accuse Plaintiff of sexual abuse (Pltf. Br. (Dkt. No. 56) at 16-17);

C.T.'s account shifted over time (id. at 10, 18); and

the adult mentors did not corroborate the girls' claims of improper touching. (Id. at 13, 18)

According to Bate, this alleged evidence vitiates any claim of probable cause. (Id. at 21-24) For the reasons explained below, Plaintiff's arguments are unpersuasive.

### 1. Alleged "Awareness of Bitter Relationship" Between the Complainants and Plaintiff

"[W]here a 'bitter prior relationship exists' that is 'known to the arresting officer before the arrest is made, a complaint from the complaining victim alone may not be enough to constitute probable cause; the officer may need to investigate further.'" Hart, 2013 WL 6139648, at *5. The officer must, of course, have had knowledge of such a bitter relationship in order for it to raise doubts as to the victim's veracity. See Boda v. Phelan, No. 11 Civ. 00028 (KAM), 2014 WL 3756300, at *3, 6 (E.D.N.Y. July 30, 2014) (detective had no reason to doubt the veracity of the victim's complaints because he was unaware of the ongoing custody dispute between the parents, and victim's statements were "consistent with other cases of sexual abuse he had investigated").

Here, Bate contends that Detective Sardina had "awareness of a bitter relationship between the girls and Plaintiff." (Pltf. Br. (Dkt. No. 56) at 21). According to Bate, he was a "strict disciplinarian," and the students were "resentful." The girls thus had a motive to falsely accuse him of sexual abuse and inappropriate touching. (Id. at 18) In support of this theory, Plaintiff points to evidence that Taylor Shea – M.M.'s adult mentor – told Detective Sardina that "the female students were particularly rowdy that year," (see Shea Decl. (Dkt. No. 55) ¶¶ 9-10); that Victoria Brady – M.J.'s adult mentor – told Detective Sardina that Plaintiff was "strict with the group" (Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 42); and that several of the adult mentors told Detective Sardina that Plaintiff often touched, rubbed, or massaged the girls' shoulders when they were acting out or being disruptive. (See Shea Decl. (Dkt. No. 55) ¶¶ 9-10; Lopez Decl. (Dkt. No. 53) ¶ 15 (stating that Bate "touched the students' shoulders when they were being disruptive to get their attention"); Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 42 (Brady stating that Bate was strict, and often put his hands

on their shoulders when they were "not listening or acting out"); McGuinness Decl., Ex. F

(DD5s) (Dkt. No. 52-6) at DEF 44 (Lee stating that she had observed Bate touch and massage

the girls' shoulders, but that "this only happened when the girls were acting out or no[t] listening

to him"); McGuinness Decl., Ex. G (DD5s) (Dkt. No. 52-7) at DEF 45 (Carden stating that

"when the girls in the program were acting out, [Bate] would put his hands on some of the girls'

shoulders")). Additionally, Gabrielle Brochard – another adult mentor in the program – told

Detective Sardina that she observed Plaintiff in conversation with K.M. during the April 24,

2014 program, and that K.M. looked upset because Plaintiff had "just reprimanded her for

something." (McGuinness Decl., Ex. I (DD5s) (Dkt. No. 52-9) at DEF 49)

 This evidence does not demonstrate the type of "bitter relationship" that would

cause a reasonable officer to doubt the accusations of six students and two of their mothers. The

evidence that Plaintiff tried to maintain order at the Big Brothers Big Sisters sessions, and that he

reprimanded K.M. on one occasion, does not suggest the kind of acrimonious relationship

between Bate and the students and their mothers that would lead the latter to fabricate complaints

of sexual abuse and improper touching. See Hart, 2013 WL 6139648, at *5 (history of ongoing

disputes and police complaints among neighbors suggested "prior bitter relationship" that

required further investigation beyond victim complaints); Mistretta, 5 F. Supp. 2d at 134 (finding

known motive to make false accusations where officer was aware that "complaint was made by

one spouse against another in the midst of divorce proceedings"); Sankar, 867 F. Supp. 2d at

302, 306 (finding known motive for false accusation where officer was aware of contentious and

violent landlord-tenant relationship); DiStefano, 2014 WL 349251, at *2, 6 (bitter dispute

between co-workers – where co-worker had threatened to kill plaintiff – could give rise to known

motive to make false accusations). There is simply no evidence that Detective Sardina was

aware that any of the six girls harbored a deep dislike of Plaintiff for reasons other than his persistent, improper, and unwanted touching.[14]

## 2. Awareness of "Dramatic Changes" in C.T.'s Account

Plaintiff also argues that C.T.'s allegations regarding the alleged breast-touching "changed dramatically through the course of Detective Sardina's investigation," and that witnesses contradicted C.T.'s statement that Plaintiff touched her breast, which should have raised doubts in Detective Sardina's mind about the veracity of C.T.'s claim. (Pltf. Br. (Dkt. No. 56) at 18-19, 20-21)

Detective Sardina was aware that C.T. did not include any allegation of Plaintiff touching her breast in the April 25, 2014 written statement she provided to P.S. 111. (See Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 5) He was also aware that she did not tell her mother or her adult mentor about this aspect of Bate's misconduct. (See Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 30, DEF 35) Moreover, two of the other complainants – X.Z. and M.M. – gave statements indicating that Bate "almost touched" or was "close to touching" C.T.'s breast. (Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 77, DEF 78) And Detective Sardina's notes of his interview with C.T. refer to a "poss.

---

[14] Assuming arguendo that Detective Sardina's knowledge that Bate had once reprimanded K.M. was sufficient to put him on notice of a bitter relationship between the two, there is still no explanation for why five other girls accused Bate of sexual abuse and improper touching. To the extent that Bate argues that Detective Sardina was aware that K.M. had organized the other girls to complain about Bate (Pltf. Br. (Dkt. No. 56) at 16-17), the evidence does not support that theory. Detective Sardina's reports indicate that K.M.'s mother and C.T.'s mother told Detective Sardina that it was their idea to report Bate's misconduct to school authorities. (Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 30, DEF 70, DEF 71) Given the consistent and reasonable explanations given by K.M., K.M.'s mother, and C.T.'s mother as to why K.M. and the other girls decided to contact school staff, Detective Sardina had no reason to doubt the veracity of the girls' complaints or to suspect that they were retaliatory. See Parisi, 2009 WL 4405488, at *7 ("[T]he probable cause standard does not require that the arresting officer affirmatively seek out reasons to doubt the victim or witness where none are apparent.").

touch[ing]" of C.T.'s breast. (See McGuinness Decl., Ex. Q (Sardina Handwritten Notes) (Dkt. No. 52-17) at 1) The record is also inconsistent as to the day on which the alleged breast touching took place. (See McGuinness Decl., Ex. C (Sardina Dep.) (Dkt. No. 52-3) at 96:1-9; Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74) This Court need not decide whether these facts and circumstances should have raised doubts in Detective Sardina's mind about the veracity of C.T.'s allegation that Bate touched her breast, however.

M.J.'s complaint about Plaintiff rubbing her thigh remained consistent throughout Detective Sardina's investigation (see Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 9 (M.J. stating that during the April 24, 2014 program, Bate had touched her leg); Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 40 (M.J. stating during Detective Sardina's May 6, 2014 interview that Bate "placed his hand on her leg near her knee" while she was wearing a skirt, and that he then "began to rub her leg with his hand"); Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 69 (MJ stating during Detective Sardina's May 13, 2014 interview that Bate "placed his hand on her leg" while she was wearing a skirt, and "rubbed his hand up and down her leg" towards her thigh)) Detective Sardina testified that he found M.J. to be credible and believed that she was telling the truth. (See Modafferi Decl., Ex. D (Sardina Dep.) (Dkt. No. 48-4) at 263:10-23) M.J.'s complaint – standing alone – provided Detective Sardina with probable cause to arrest Plaintiff. See, e.g., Romeo, 385 F. App'x at 49 ("New York courts have held that the upper leg and upper thigh are intimate parts within the meaning of the [Sex Abuse in the First Degree] statute." (collecting cases)); Morbelli, 144 Misc. 2d at 484 (alleged touching of victim's leg and thigh constituted sexual contact under N.Y. Penal Law § 130.00(3)).

And whatever inconsistencies there may be in C.T.'s account of the breast-touching, those inconsistencies do not cast doubt on the other girls' allegations that Plaintiff persistently massaged and rubbed their shoulders and backs despite requests that he not do so, that he was "looking down the back of [C.T.'s] pants while she was sitting" and staring at her underwear, and that he rubbed K.T.'s foot. (See Modafferi Decl., Ex. F (Written Complaints) (Dkt. No. 48-6) at DEF 77, DEF 78, DEF 79 (X.Z., A.S., and M.M. complaining that Bate rubbed their shoulders); Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 27, DEF 28, DEF 11, DEF 65, DEF 71 (X.Z., M.M., C.T., A.S. and K.M. complaining that Bate massaged and/or rubbed their shoulders, and that it made them feel uncomfortable); Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 11, DEF 27, DEF 71 (C.T., X.Z., and K.T. complaining that Bate was staring at C.T.'s underwear)).

Moreover, both C.T.'s mother and K.M.'s mother confirmed that C.T. and K.M. had previously complained to them about Bate rubbing and massaging their shoulders. (See Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 30 (C.T.'s mother confirming that when Bate took over as program manager, C.T. began complaining that Bate was "massaging her shoulders, and touching her back"); Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 70 (K.M.'s mother confirming that K.M. had told her mother that Bate had "rubbed her shoulders," and "that it made her feel uncomfortable").

This continuing course of conduct – which took place over a four-month period between Bate's arrival at the Big Brothers Big Sisters program in January 2014 and the April 24, 2014 session – considered together with the allegations that Bate had rubbed M.J.'s thigh, provided Detective Sardina with probable cause to arrest Plaintiff. See, e.g., Guzman, 340 F. App'x at 681 ("'[A] defendant may be guilty of [endangering the welfare of a child] by virtue of

a series of acts, none of which may be enough by itself to constitute the offense, but each of which when combined make out the crime.'"); Toft, 156 A.D.3d at 1235 (upholding conviction for endangering the welfare of a child based on "inappropriate physical contact"); Sanderson, 68 A.D.3d at 1717 ("[A] rational jury could have found that defendant 'knowingly act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of [the] child,' based on testimony that, inter alia, defendant attempted to kiss the victim while he was alone with her.").

### 3. Alleged Failure of Adult Mentors to Corroborate the Minor Complainants' Allegations

Plaintiff contends that Detective Sardina should have realized that the six minor complainants and two of their mothers were lying, because the adult mentors stated that they had observed no improper touching. (Pltf. Br. (Dkt. No. 56) at 13, 21, 27, 29)

The mentors, of course, had a motive to say that they had seen nothing untoward. But more importantly, a number of the mentors made statements to Detective Sardina that tended to corroborate the girls' accusations. For example, it is undisputed that Taylor Shea told Detective Sardina that she had noticed Plaintiff place "his hands on [the girls'] shoulder[s] or rub their backs," and that "she thought the girls were uncomfortable." (Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 34; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 57) ¶¶ 54-55) Victoria Brady, Stephanie Lopez, and Siu Kay Lee likewise told Detective Sardina that they had observed Plaintiff touch or massage the girls' shoulders. (See Lopez Decl. (Dkt. No. 53) ¶ 14; Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 42 (Brady stating that she observed Bate touch the girls' shoulders, and that she believed C.T. looked uncomfortable); McGuinness Decl., Ex. F (DD5s) (Dkt. No. 52-6) at DEF 44 (Siu Kay Lee stating that she observed "[Bate] touching [the] girls' shoulders and massaging their shoulders," and that Bate "may have massaged or touched the shoulders of A.S")) Brady and Lopez also stated that C.T.

looked and/or reported feeling uncomfortable when Plaintiff touched her shoulders. (See

Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 35, DEF 42; Pltf. Resp. to Def. R.

56.1 Stmt. (Dkt. No. 57) ¶ 58) Acknowledging that most of the adult mentors did not observe

Bate engage in what they believed to be inappropriate touching, several of the mentors made

statements to Detective Sardina that tended to corroborate the girls' accusations.

*      *      *      *

The Court concludes that Plaintiff has not proffered sufficient evidence to raise a

material issue of fact as to whether Detective Sardina had reason to doubt the veracity of the

girls' allegations that Plaintiff had rubbed M.J.'s thigh, and massaged and/or rubbed the minor

complainants' shoulders and backs. Accordingly, Detective Sardina had a reasonable basis to

believe that there was probable cause to arrest.[15]

---

[15] Plaintiff also faults Detective Sardina for not investigating Plaintiff's explanation to Mr. Bautista – the Director of the Big Brother Big Sister program – that Plaintiff only touched the girls' shoulders "as a technique to get them to focus." (See Pltf. Br. (Dkt. No. 56) at 20, 24; McGuinness Decl., Ex. D (DD5s) (Dkt. No. 52-4) at DEF 31) It is axiomatic, however, that "[o]nce a police officer has a reasonable basis to believe there is probable cause to arrest, the officer is not required to explore or eliminate every theoretically plausible claim of innocence before making an arrest." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (citations omitted); Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989) ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected, and not to finally determine guilt through a weighing of the evidence."). Accordingly, "possible claims of innocence," or "conflicting accounts between a complainant and the accused do not negate probable cause." DiStefano, 2014 WL 349251, at *8; Hart, 2013 WL 6139648, at *6 (Because "the officers had a reasonable basis for believing that probable cause existed[, they] were not required to investigate . . . possible claims of innocence before arresting him."); Awelewa v. New York City, No. 11 Civ. 778 (NRB), 2012 WL 601119, at *3 (S.D.N.Y. Feb. 23, 2012) ("Even in a case where the police are presented with competing accounts from the victim complainant and the accused, the 'police do not have to disprove [the] accused's claim of innocence to rely on [the] victim's account as probable cause for arrest.'" (quoting Koester v. Lanfranchi, 288 F. App'x 764, 767 (2d Cir. 2008))); Morris v. City of New York, No. 12 Civ. 3959, 2013 WL 5781672, at *7 (E.D.N.Y. Oct. 28, 2013) ("Morris further alleges that [the officer] did not sufficiently investigate the accusations made against her before arresting her. . . . [P]robable cause[, however,] requires only a probability, or a "substantial chance" of criminal

## III. MALICIOUS PROSECUTION

To prevail on a malicious prosecution claim under Section 1983, "a plaintiff must show a violation of his rights under the Fourth Amendment[] . . . and must establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" Id. at 161 (internal quotation marks and citation omitted) (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)).

As with false arrest, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003) (citing Colon v. City of New York, 60 N.Y.2d 78, 82 (1983)). "For malicious prosecution [claims], 'the determination of probable cause is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest.'" Drummond v. Castro, 522 F. Supp. 2d 667, 677-78 (S.D.N.Y. 2007) (quoting Carson v. Lewis, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999)). "'[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause.' In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." McClanahan v. Kelly, No. 12 Civ. 6326 (PGG), 2014 WL 1317612, at *5 (S.D.N.Y. Mar. 31, 2014) (quoting Lowth v. Town of Cheektowaga, 82

---

activity, not an actual showing of criminal activity. The police are neither required nor equipped to adjudicate whether criminal conduct has actually occurred." (internal citations omitted)).

F.3d 563, 571 (2d Cir.1996)).

Here, Plaintiff has not identified any intervening facts that arose between his arrest and the commencement of his prosecution. Instead, Plaintiff contends that Detective Sardina misrepresented the findings of his investigation by allegedly misstating in his closing reports that "the group of [New York Life] employees that worked on the [April 24, 2014] program corroborated the statements from students about [Bate] touching the girls inappropriately" (see Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74), and by omitting critical exculpatory information from his closing reports. (Pltf. Br. (Dkt. No. 56) at 25-27)

As an initial matter – and as discussed above – several New York Life employees at the Big Brothers Big Sisters April 24, 2014 program gave statements to Detective Sardina that tended to corroborate the girls' complaints that Bate touched, rubbed, and/or massaged the girls' shoulders. (See Modafferi Decl., Ex. E (DD5 Reports) (Dkt. No. 48-5) at DEF 34, DEF 35, DEF 42; McGuinness Decl., Ex. F (DD5s) (Dkt. No. 52-6) at DEF 44) Accepting that Sardina's closing reports overstate the amount of mentor corroboration – by suggesting that all of the New York Life employees present at the April 24, 2014 event had corroborated the girls' accusations – Detective Sardina hid no exculpatory information from the District Attorney's Office. Detective Sardina turned over all of his reports to the District Attorney's Office before Plaintiff was arrested, including all the reports concerning his interviews of the adult mentors. (See Modafferi Decl., Ex. 1 (Sardina Dep.) (Dkt. No. 58-1) at 171:6-24, 244:8-19; Modafferi Decl., Ex. E (DD5s) (Dkt. No. 48-5) at DEF 57; McGuinness Decl., Ex. S (DD5) (Dkt. No. 52-19) at DEF 74) Accordingly, the evidence does not demonstrate that Detective Sardina withheld exculpatory evidence from the prosecutor. See Greene v. City of New York, No. 08 Civ. 00243

(AMD) (CLP), 2017 WL 1030707, at *25 (E.D.N.Y. Mar. 15, 2017) ("[I]t is clear that the prosecutors had the DD5 of Eric Head's interview, as well as both detectives' notebooks, and were aware of the difference in potential perpetrators that each one identified. Under these circumstances, the plaintiff has not pointed to evidence that [the detective] provided misleading information to prosecutors.").

The Court concludes that Plaintiff's malicious prosecution claim fails because there was probable cause to believe that he had committed the charged offenses at the time the criminal complaint was filed.

## IV. QUALIFIED IMMUNITY

"'The doctrine of qualified immunity shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known.'" Hill v. City of New York, No. 05 Civ. 9473 (RMB) (JCF), 2006 WL 2347739, at *6 (S.D.N.Y. Aug. 14, 2006) (quoting Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999)). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996) (quoting Malley v. Briggs, 475 U.S. 335, 335, (1986)). Where "'officers of reasonable competence could disagree on the legality of an act, immunity should be recognized.'" Id. (citations omitted). "Since qualified immunity is intended to protect government officials from the harassing and expensive burdens of litigation as well as the threat of monetary damages, courts have encouraged the use of summary judgment as a procedural device to dispose early in the litigation process of those claims barred by qualified immunity." Rodriguez v. Phillips, 66 F.3d 470, 475 (2d Cir. 1995).

"Even if probable cause to arrest is ultimately found not to have existed, an

arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). Arguable probable cause to arrest exists if either "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016) (internal quotation marks and citations omitted). "[A]n 'arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" McClellan v. Smith, 439 F.3d 137, 147-48 (2d Cir. 2006) (emphasis in original) (citations omitted). "'Because qualified immunity is an affirmative defense, defendants bear the burden of showing that there was arguable probable cause.'" Nunez v. City of New York, No. 14 Civ. 4182 (RJS), 2016 WL 1322448, at *5 (S.D.N.Y. Mar. 31, 2016) (quoting Gaston v. City of New York, 851 F. Supp. 2d 780, 795 (S.D.N.Y. 2012)).

Here, even assuming arguendo that Detective Sardina did not have probable cause to arrest Plaintiff, the undisputed facts demonstrate that – at a minimum – reasonable officers could disagree on whether the probable cause test was met. As discussed above, given the absence of proof showing that Detective Sardina was aware of a "bitter relationship" between Plaintiff and the girls, and the girls' consistent and detailed complaints – which were corroborated, at least in part, by C.T. and K.T.'s mothers as well as several adult mentors in the Big Brothers Big Sisters program – "one could make at least colorable arguments" that there was probable cause to arrest plaintiff. See Donovan v. Briggs, 250 F. Supp. 2d 242, 255 (W.D.N.Y. 2003). For this reason, Detective Sardina is entitled to qualified immunity on Plaintiff's false

arrest and malicious prosecution claims. See, e.g., id.; Greene, 2017 WL 1030707, at *21 ("At a minimum, even if the officers did harbor some doubts as to [the complainant's] credibility or the accuracy of the identification, they would be protected by qualified immunity, because [the complainant's] identification provided arguable probable cause to arrest the plaintiff."); Tabor v. New York City, No. 11 Civ. 195 (FB) (CLP), 2013 WL 4775608, at *6 (E.D.N.Y. Sept. 6, 2013) ("The Court has held that reasonable officers could disagree as to whether A.H. was credible. While that holding precluded summary judgment as to actual probable cause, it compels a finding of arguable probable cause. As a result, the individual defendants are entitled to qualified immunity."); Parisi, 2009 WL 4405488, at *9 ("For the same reasons discussed above, there can be no doubt that, at a minimum, officers of reasonable competence could disagree on whether there was probable cause to arrest Parisi on the simple accusation of the claimed victim alone, much less when supported by corroborating evidence.").[16]

## V.     ASSAULT AND BATTERY

"Under New York law, '[a]n "assault" is an intentional placing of another person in fear of imminent harmful or offensive contact. A "battery" is an intentional wrongful physical contact with another person without consent.'" Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)). "A lawful arrest is not an assault or battery under New York law, provided the force used is reasonable." Figueroa v. Mazza, 825 F.3d 89, 105 n.13 (2d Cir. 2016) (citing Cunningham v. United States, 472 F. Supp. 2d 366, 381 (E.D.N.Y. 2007)). By contrast, "[i]f an

---

[16]  Plaintiff contends that Detective Sardina is not entitled to qualified immunity because he misrepresented the evidence to the District Attorney's Office. (Pltf. Br. (Dkt. No. 56) at 29)  As discussed above, this Court finds that Detective Sardina delivered all of his reports to the District Attorney's Office. Accordingly, the District Attorney's Office had all of the relevant information in Detective Sardina's possession at the time it decided to prosecute.

arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest," including handcuffing a plaintiff and placing him in a police vehicle. Sulkowska v. City of New York, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001) (citing Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340, 665 (2d Dept. 1997); Nelson v. Town of Glenville, 220 A.D.2d 955, 955 (3d Dept. 1995); Pawloski v. State, 258 N.Y.S.2d 258, 265 (1965)).

Even in the absence of probable cause, police officers are "entitled to good faith immunity" under New York law, so long as their actions are not unreasonable or made in bad faith. See Tsesarskaya v. City of New York, 843 F. Supp. 2d 446, 460 n. 12 (S.D.N.Y. 2012). "'Good faith immunity' under New York law is similar to qualified immunity under federal law." Id. "If the detective defendants [a]re entitled to qualified immunity under federal law, summary judgment would be similarly appropriate" on plaintiff's state law claims. See Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007); Mesa v. City of New York, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *27 (S.D.N.Y. Jan. 3, 2013) ("[A]s the force employed against Mesa was objectively reasonable under the circumstances – giving rise to a finding of qualified immunity – her assault and battery claims must fail as well."); Gilliard v. City of New York, No. 10 Civ. 5187 (NGG) (CLP), 2013 WL 521529, at *12 n. 11 (E.D.N.Y. Feb. 11, 2013) ("New York's good faith immunity doctrine parallels federal qualified immunity jurisprudence.").

For the reasons set forth above, there was probable cause to arrest Plaintiff, and – in any event – Detective Sardina is entitled to good faith immunity. Defendants' motion for summary judgment on Plaintiff's assault and battery claims will be granted.

## **CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is granted in its entirety. The Clerk of Court is directed to terminate the motion (Dkt. Nos. 47, 67), and to close this case.

Dated: New York, New York
       September 29, 2018

                                SO ORDERED.

                                Paul G. Gardephe
                                United States District Judge